## CONTROL AS TO BRIDGES OVER NAVIGABLE WATER-WAYS.

[Circuit Court of Ashtabula County.]

THE STATE OF OHIO, EX REL LEWIS HARPER, A TAX-PAYER, v. THE COMMISSIONERS OF ASHTABULA COUNTY.

Decided, September Term, 1905.

*Constitutional Law—Authority of War Department—To Condemn Bridges Obstructing Navigable Waterways—Jurisdiction of State Courts—To Enjoin County Commissioners from Carrying Out Order for Replacing of Bridge—Validity of the Ohio Bridge Act of 1904.*

The act of March 24, 1904 (97 O. L., 53), authorizing county commissioners to remove bridges which have been condemned by the War Department, under authority of law as an obstruction to navigation, and rebuild them in accordance with plans for the improvement of navigation, is a valid law; and the order of the Secretary of War with reference to the removal of the county bridge over the Ashtabula river, on Bridge street in the city of Ashtabula, Ohio, was a valid order.

BURROWS, J. (dissenting.)[*]

In this action the court of common pleas held, on general demurrer to the petition, that it did not state facts sufficient to entitle the plaintiff to the relief therein demanded.

The circuit court, on error, reverses that judgment and directs the court of common pleas to overrule the demurrer and grant a temporary injunction as prayed for in the petition.

That there may be no mistake as to what the petition contains, a full copy, omitting the caption, is here given:

"The defendants are the duly elected, qualified and acting commissioners of Ashtabula county.

"Your relator is a citizen, resident and tax-payer of Ashtabula county, and brings this action for the benefit of said county and its tax-payers.

"On March 20, 1905, relator, as such tax-payer, duly requested the prosecuting attorney of said county, in writing, to bring this action, and he refused to do so.

[*] For majority opinions, see 7 C. C.—N. S., 469.

''The defendants are about to, and unless enjoined they will, construct a new bridge across the Ashtabula river, upon the line of Bridge street at Ashtabula harbor in the city of Ashtabula, at a cost of two hundred thousand dollars, and ask for bids and enter into a contract for building the same, and issue and sell the bonds of said county in the sum of two hundred thousand dollars and appropriate the proceeds thereof to pay for the construction of said bridge, and levy a tax on the people of said county to provide for the redemption of said bonds and the interest to accrue thereon. They have advertised to sell said bonds and invited bids therefor.

''The defendants have not submitted to the voters of said county, the question as to the policy of building said bridge, and do not intend to do so.

''There has been no casualty requiring the construction of said bridge, but it is intended to replace the one now in use at said place that is in good condition, repair, and perfectly safe for public travel.

''The defendants claim authority and the right to proceed as aforesaid under an act of the General Assembly of the state of Ohio, entitled 'An act to authorize county commissioners to issue bonds and levy a tax for the purpose of rebuilding, replacing or constructing anew any bridge or bridges condemned or ordered removed by the war department of the United States,' passed March 24, 1904, and approved March 26, 1904 (97 O. L., 53), and under an order claimed to have been issued by the War Department of the United States, notifying the defendants to make certain changes and alterations in the bridge which now crosses the river at said place.

''Said order purports to have been made by virtue of Section 18 of 30 U. S. Stat. at L., 1121, entitled 'An act making appropriations for the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes,' approved March 3, 1899, and under the claim that said present bridge is an unreasonable obstruction to the navigation of said river and harbor (which are navigable waterways). Said act does not apply to counties or county commissioners, and confers no authority upon the War Department or Secretary of War to make the order aforesaid. Said act is only enforceable, as fully appears by its terms, by criminal prosecution, and by conviction and punishment for crime. If said act applies to counties, it contravenes the Constitution of the United States, and exceeds the power granted to Congress by the Constitution, and it is, therefore, null and void.

"Said order was made arbitrarily, without authority of law, without hearing or evidence, and contrary to the facts. Before its issuance, Dan. R. Kingman, a United States engineer, called the defendants to several conferences, and in May, 1904, to what is claimed to be a final hearing before him at Cleveland, Ohio. No evidence whatever was offered at said pretended hearing to the effect that the present bridge is an unreasonable obstruction to navigation, and nothing whatever was offered in favor of the issuance of said order, except the statements, not under oath, of representatives of the Lake Shore & Michigan Southern Railway Company, and the Pennsylvania Company, that the proposed change would greatly benefit said railroad corporations, and enhance the value of their dock and river property at said harbor, and give to said Pennsylvania Company at least fifty feet of additional dock frontage; and that, if the order were made, said railroad corporations would contribute largely to the expense of building said new bridge. Thereupon said engineer stated that the order would be issued, and afterwards, to-wit, in June, 1904, an order was issued as aforesaid, but not, however, until after the first application or recommendation of said engineer to the War Department for said order had been refused and turned down by that department. All of which fully appears by the records of the office of said engineer at Cleveland, Ohio.

"Your relator informs the court that said railroad corporations own valuable docks and lands available for dock purposes at said harbor that will greatly enhance in value by the proposed change (which change will be hereinafter specifically pointed out); that said Pennsylvania Company owns docks on the west side of the river just south of and adjacent to said present bridge and will acquire by the proposed change at least fifty feet of additional dock frontage out of what is now the navigable channel of said river; that said United States engineer was induced to cause said order to be issued by the promise of said railroad corporations to contribute largely to the expense of the proposed new bridge, but that said corporations have ever since wholly failed and refused to contribute anything whatever therefor.

"Said present bridge was built by the Commissioners of Ashtabula County, in 1889, with the approval of the lake carriers and vessel owners and their associations, has been in operation ever since, is now sound, in good condition, repair, and perfectly safe for public travel. It is a swing bridge with a 120 foot draw, with its navigable opening exactly over and substantially the entire width of the present and natural channel of the river at

that point and its center pier, on which the bridge swings, on the east side of the river, entirely east·of the established dock and harbor lines of said harbor.

"Said bridge is not an unreasonable obstruction to navigation. The largest boats on the lakes are only fifty-five feet in width and less than 600 feet in length. At the point said bridge crosses there is a bend in the river with its outer curve to the west. If there is any difficulty in passing said bridge by the largest and longest boats it is owing to the shape of the river and not to any fault of the bridge.

"The order aforesaid notifies the defendants to entirely remove said center pier of the present bridge and dredge and excavate. at said point to a depth of twenty-one feet below mean lake level, but makes no complaint or order concerning the west abutment of said bridge.

"The defendants propose, intend to, and will, unless enjoined, entirely remove the present bridge and excavate on the east side of the river where its center pier now is to a depth of twenty-one feet below mean lake level, and build a new bridge of the jack knife or lift pattern with its east abutment in Bridge street (formerly a country road) at least fifty feet east of the established dock and harbor lines of the harbor, and about the same distance east of the water line of the river which very nearly coincides with the harbor line at that point, and its west abutment and the street leading thereto extended at least fifty feet out into the present and navigable channel of the river. This will cut off at least fifty feet from the west side of said navigable channel and constitute a serious obstruction to navigation, and will necessitate the dredging out and making a new navigable channel for said river east of the present one with its eastern boundary entirely east of and beyond the present eastern harbor and water lines of the river.

"Your relator informs the court that the object sought to be accomplished by said order, and the proposed plans and work of the defendants, is to straighten said river by moving its channel at least fifty feet east of the present location, and permit the said Pennsylvania Company to fill in and reclaim for dock purposes an equal distance out of the west side of the present navigable channel of the river.

"The aforesaid act of the General Assembly of the state of Ohio contravenes—

· "Sections 1, 2, 19, 20, Article I; Sections 22, 26, Article II; Sections 5, 7, Article X; Sections 2, 5, 6, Article XII; Section I, Article XIII of the Constitution of Ohio, and the Fifth and

Fourteenth Amendments to the Constitution of the United States. Said act contravenes other provisions of the state and federal Constitutions, is void and of no effect, and confers no authority upon the defendants to do the acts intended. At the time said act was passed and ever since there has been no other bridge in the state under the control of county commissioners, claimed to have been condemned or ordered removed by the War Department of the United States.

. "Wherefore, your relator prays that the defendants be enjoined from issuing and selling said bonds, and appropriating the proceeds to the building of said bridge, and levying said tax, and entering into contracts for said purposes, and for such other and further relief as is proper."

This action was commenced on the relation of a tax-payer under favor of Revised Statutes, 1277, 1278. The matters that may be investigated and enjoined in such proceedings are enumerated in Revised Statutes, 1277, which provides:

"The prosecuting attorneys of the several counties of the state, upon being satisfied that the county, or any public money in the hands of the county treasurer or belonging to the county, are about to be, or have been, misapplied, or that any such public moneys have been illegally drawn out of, or withheld from, the county treasury, or that a contract in contravention of the laws of this state has been, or is about to be entered into, or has been or is being executed, or that a contract was procured by fraud or corruption, * * * may apply, by civil action in the name of the state, to a court of competent jurisdiction, to restrain such contemplated misapplication of funds, or the completion of any such illegal contract not fully completed." * * *

Revised Statutes, 1278, provides that when the prosecuting attorney for any reason can not bring the action, or refuses to do so on written request, the action may be instituted by a tax-payer in the name of the state.

An inspection of the petition shows that this action is based upon such allegations therein as charge that the defendants, as county commissioners, are "about to enter into a contract" for the building of a new bridge "in contravention of the laws of this state;" and accordingly, the whole question is whether it appears from the petition that the proposed action of the com-

missioners in contracting for the removal of the present bridge and building a new one, is in contravention of the laws of this state.

Unquestionably, the authority of county commissioners to build bridges or raise money for that purpose must be conferred by statute, and any attempt on their part to do either in the ab-absence of such authority would be in contravention of the laws of this state. Prior to 1904 their power to build and repair bridges in their county when the cost did not exceed $10,000 was limited only by their discretion and judgment; but when the cost exceeded that sum, a vote in favor of the project was necessary. This limitation did not apply, however, in cases of casualties to certain important bridges. By the act of March 24, 1904 (97 O. L., 53), county commissioners were authorized in cases therein specified to remove and rebuild bridges at a cost not exceeding two hundred thousand dollars. This act is as follows:

"An act to authorize county commissioners to issue bonds and levy a tax for the purpose of rebuilding, replacing or con-structing anew any bridge or bridges condemned or ordered removed by the War Department of the United States.

"*Be it Enacted by the General Assembly of the State of Ohio:*

"Section 1. That the county commissioners of any county having control of any bridge or bridges which have been con-demned or ordered removed by the War Department of the United States, under authority of law, as an obstruction to navigation, shall have power to remove such bridge or bridges and to rebuild or replace the same or construct a new bridge or bridges over the stream or streams crossed by the bridge or bridges so con-demned or ordered removed; and for that purpose such commis-sioners shall have power to purchase or appropriate property, in the manner provided by law, to widen the channels of such stream or streams."

It is self-evident that if this is a valid law, and the bridge had been lawfully condemned or ordered removed as provided in said act, the proposed action of the defendants was in pursuance of the laws of this state. The fact that the majority opinions go no further than to doubt its validity does not call for an

extended discussion of this question, inasmuch as it is a settled rule of decision in this state and elsewhere that it is only when the irreconcilability of a legislative enactment with the Constitution is clear and free from doubt that courts are warranted in declaring such enactment invalid. This sort of legislation is common in this state and has been from its earliest history. The amount of public money that may be expended by public officials for one public purpose or another, under one set of circumstances or another, has always been determined by the Legislature and its competency to make such determination has never been questioned. Indeed, if this law is not valid, why is not the statute giving authority for large expenditures in cases of casualties to highways and bridges, and all laws making discrimination as to the amounts that may be expended for public purposes under various circumstances unconstitutional? The many authorities cited by counsel for the defendants and published in connection with the majority opinion fully cover this question.

The power to expend such sum of money for the purposes named in said act is made to depend upon the existence of the following facts: The bridge must be over a navigable waterway of the United States; it must have been condemned or ordered removed by the War Department; and, such condemnation or order must be made under authority of law.

The action of the War Department contemplated by this act is derived from Section 18 of 30 U. S. Stat. at L., 1121, which is as follows:

"That whenever the Secretary of War shall have good reason to believe that any railroad or other bridge now constructed, or which may hereafter be constructed, over any of the navigable waterways of the United States, is an unreasonable obstruction to the free navigation of such waters on account of insufficient height, width of span, or otherwise, or where there is difficulty in passing the draw opening or the draw span of such bridge by rafts, steamboats, or other water-craft, it shall be the duty of the said secretary, first giving the parties reasonable opportunity to be heard, to give notice to the persons or corporation owning or controlling such bridge so to alter the same as

to render navigation through or under it reasonably free, easy, and unobstructed; and in giving such notice he shall specify the changes recommended by the chief of engineers that are required to be made, and shall prescribe in each case a reasonable time in which to make them. If at the end of such time the alteration has not been made, the Secretary of War shall forthwith notify the United States District Attorney for the district in which such bridge is situated, to the end that the criminal proceedings hereinafer mentioned may be taken. If the persons, corporation, or association owning or controlling any railroad or other bridge shall, after receiving notice to that effect, as hereinbefore required, from the Secretary of War, and within the time prescribed by him, willfully fail or refuse to remove the same or to comply with the lawful order of the Secretary of War in the premises, such person, corporation, or association shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding five thousand dollars, and every month such persons, corporation, or association shall remain in default in respect to the removal or alteration of such bridge, shall be deemed a new offense, and subject the persons, corporation, or association so offending to the penalties above prescribed: *Provided,* that in any case arising under the provisions of this section an appeal or writ of error may be taken from the district courts or from the existing circuit courts direct to the Supreme Court either by the United States or by the defendants.''

By the terms of this statute the action of the War Department therein authorized is limited to bridges ''over the navigable waterways of the United States;'' and, therefore, at the outset of this discussion, it must be determined whether the bridge in question was over such waterway. That the bridge is over a waterway, navigable for the largest boats on the lakes, is asserted in the petition, while the authority of the United States over the same is not denied but is impliedly assumed by its averments. It is therein alleged that the present bridge was built with the approval of the lake carriers and vessel owners and other associations, thereby assuming and implying that such associations were interested in the free navigation of this stream and that the bridge was built so as not to prejudice their interests. At this day it will hardly be contended that a stream which by itself or in connection with other waters forms a continuous

channel through which interstate commerce is carried on is not a waterway of the United States. It is stated and reiterated in the majority opinion, as if it were a circumstance of importance, that this harbor and river lie wholly within this state. The same might be said of all of Lake Erie lying north of Ohio up to the Canada line; and all the rivers and inland lakes of this country outside of the District of Columbia and the territories, lie wholly within one or more of the states. What constitutes a river or other body of water a waterway of the United States, was determined and elucidated by Chief Justice Marshall eighty years ago; and the correctness of his definition and decision has ever since remained unquestioned. In *Gibbons* v. *Ogden*, 22 U. S. (9 Wheat.), he says, at page 194:

"Commerce among the states can not stop at the external boundary line of each state, but may be introduced into the interior.

"It is not intended to say that those words comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states."

Again, page 195:

"The deep streams which penetrate our country in every direction, pass through the interior of almost every state in the Union, and furnish the means of exercising this right."

Again, page 196:

"This principle is, if possible, still more clear, when applied to commerce 'among the several states.' They either join each other, in which case they are separated by a mathematical line, or they are remote from each other, in which case other states lie between them. What is commerce 'among' them; and how is it to be conducted? Can a trading expedition between two adjoining states commence and terminate outside of each? And if the trading intercourse be between two states remote from each other, must it not commence in one, terminate in the other, and probably pass through a third? Commerce among the states must, of necessity, be commerce with the states."

Again, page 197:

"The power of Congress, then, comprehends navigation within the limits of every state in the Union; so far as that navigation may be, in any manner, connected with 'commerce with foreign nations, or the several states.' "

The following are citations from the U. S. Digest:

"All our waterways are navigable waterways of the United States within the meaning of the acts of Congress in contradistinction from navigable waters of the states where they form in their ordinary condition, by themselves or by uniting with other waters, a continuous highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water.

"*Steamer Daniel Ball* v. *United States*, 77 U. S. (10 Wall.), 557; *The Montello*, 78 U. S. (11 Wall.), 411; *The Montello*, 87 U. S. (20 Wall.), 430; *Cardwell* v. *Bridge Co.*, 113 U. S., 205.

"The Chicago river and its branches, although entirely within the limits of Illinois, form, in connection with other waters, a continuous channel for commerce among the states, and are therefore navigable waters of the United States, subject to the commercial power of Congress. *Escanaba Co.* v. *Chicago*, 107 U. S., 678.

"By 'navigable waters of the United States' are meant such as are navigable in fact, and which, by themselves or their connections with other waters, form a continuous channel for commerce with foreign countries or among the states." *Miller* v. *New York*, 109 U. S., 385.

Applying the definition of a waterway of the United States, as established by these decisions, to the averments of the petition, and to the facts derived from common knowledge and official documents which show that this river and harbor is a part of a continuous channel and highway of interstate commerce of such importance that the government has expended and is expending large sums of money in improving the same, with what reason can it be said that this bridge is not over a waterway of the United States?

The next question is: Was the bridge condemned or ordered removed by the War Department? As both majority opinions practically concede that such order was made by the Secretary

of War, that question might be passed without further discussion. The petition expressly avers that the commissioners claim the right to build the bridge "under an order claimed to have been issued by the War Department of the United States;" that "said order purports to have been made by virtue of Section 18 of an act of the Congress of the United States;" that, "before its issuance, Dan. R. Kingman, a United States engineer, called the defendants to several conferences, and in May, 1904, to what is claimed to have been a final hearing before him at Cleveland, Ohio;" that "nothing whatever was offered in favor of the issuance of said order except the statements, not under oath, of the Lake Shore & Michigan Southern Railway Company and the Pennsylvania Company  *  *  *  that the proposed change would greatly benefit said railroad corporations, and that, if the order were made, said railroad corporations would contribute largely to the expense of building said new bridge.  Thereupon said engineer stated that the order would be issued, and afterwards, to-wit, in June, 1904, an order was issued as aforesaid but not, however, until the first application or recommendation of said engineer to the War Department for said order had been refused and turned down by the War Department."

The claim, therefore, that such order was not issued by the War Department can only be maintained by denying the truth of the averments of the petition.

The remaining pertinent question is: Was the order of the War Department made under authority of law?  The grounds upon which it is claimed that it was not are: That Section 18 of said act is unconstitutional; that it attempts to delegate to an executive officer judicial and legislative functions; and that bridges under control of county commissioners are not within the purview of this section.

It is asserted that Congress exceeded its power when it invested the Secretary of War with the authority and duty of determining whether a bridge was an unreasonable obstruction to navigation, and of directing the changes to be made to obviate the difficulty. The power of Congress to adopt such means as it deems appropriate to prevent the obstruction of its navigable waterways

is limited only by its discretion and by such restrictions as are imposed by the Constitution. This is authoritatively held in the case of *Gibbons* v. *Ogden, supra.* At page 196, Chief Justice Marshall in announcing the unanimous opinion of the court says:

"We are now arrived at the inquiry, what is this power?

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution. These are expressed in plain terms, and do not affect the questions which arise in this case, or which have been discussed at the bar. If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several states, is vested in Congress as absolutely as it would be in a single government, having in its Constitution the same restrictions on the exercise of power as are found in the Constitution of the United States. The wisdom and the discretion of Congress, their identity with the people, and the influence that their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments."

The supremacy of Congress is illustrated in *Pennsylvania* v. *Bridge Co.,* 59 U. S. (18 How.), 421, where it is held that Congress may nullify a decree of the Supreme Court by which a bridge had been pronounced a public nuisance and an obstruction to navigation. The only restrictions upon Congress in the exercise of this power is found in that part of the Fifth Amendment to the federal Constitution which provides that:

"No person shall  *   *   * · be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

It is apparent from the whole context of this section that no property is or can be taken until after the right to do so is adjudicated in a court of competent jurisdiction. The rule

applicable to such case, as formulated by Mr. Justice Miller, in *Davidson* v. *New Orleans,* 96 U. S., 104, is this:

"That whenever by the laws of a state, or by state authority, a tax, assessment, servitude, or other burden is imposed upon property for the public use, whether it be for the whole state or of some limited portion of the community, and those laws provide for a mode of confirming or contesting the charge thus imposed, in the ordinary courts of justice, with such notice to the person, or such proceedings in regard to the property as is appropriate to the nature of the case, the judgment in such proceedings can not be said to deprive the owner of his property without due process of law."

This proposition is quoted and approved by our Supreme Court in *State* v. *Jones,* 51 Ohio St., 492, 516, and *Probasco* v. *Raine,* 50 Ohio St., 378, 392. The Secretary of War is authorized to do no more than make a preliminary investigation to ascertain whether in his opinion a bridge complained of is an unreasonable obstruction to navigation and direct the changes which in his opinion are necessary; and determine the reasonable time in which the suggested changes shall be made, and notify those having control of the bridge thereof. If the suggested changes are not made within the time specified in the notice it is his duty to notify the United States District Attorney of that fact; and there his authority and duty in the matter end. If any further action is taken it must be had in the courts. All assertions that this section gives or attempts to give to the Secretary of War power to make final adjudication or compel the removal of bridges or the construction of new ones are unwarranted. It can not be doubted that Congress has ample power to provide by appropriate legislation that all obstructions to the free navigation of the waterways of the United States shall be removed. At common law and by the statutes of the several states an obstruction of navigable water is made a misdemeanor. It is usually provided that when the party charged in an indictment is found guilty of maintaining a nuisance its abatement may be ordered by the court. In this act, however, no provision is made for an order of abatement, and the only method that can be

pursued to secure the enforcement of the requirements of the secretary is the repeated prosecution and imposition of penalties therein provided. In prosecutions under this section it must be alleged and proven that the defendant "willfully" neglected or refused to comply with the order of the secretary. It has been held that the word "malicious" is equivalent if not more than equivalent to "willfully" in a criminal statute, and that "unlawfully" is not. Charging an act as done willfully imports that it is done intentionally and in disregard of duty, and not for the purpose of maintaining, in good faith, some legal right. As we have seen, the order of the secretary is ineffective except as a basis for prosecutions, and the assumption that every right or the defendant on trial for failure to comply with the order of the secretary, will not be duly considered and preserved in such prosecution, is an unjust imputation upon the courts.

But there is another and better interpretation of this phrase, "under authority of law" as used by our Legislature, which renders the discussion of the validity of the act of Congress far fetched and unnecessary. The petition alleges that this act of 1904 was passed March 25, for the purpose of enabling this particular bridge to be built; and whether that is so or not, the purpose of the act was to enable county commissioners in such cases, to avoid the delay incident to raising money by taxation or in pursuance of a vote. Section 18 of the act of Congress was the only act then in force authorizing the Secretary of War to condemn bridges or order them to be removed. It is to be presumed that the legislators had knowledge of this section and had reference to it when they used the phrase "under authority of law." The General Assembly assumed, as it had a right to assume, that the Secretary of War was duly authorized to make such order; and the true intent and meaning of the phrase "under authority of law" as used by the Legislature, was that county commissioners should be authorized to act when a bridge was condemned or ordered removed by the War Department in pursuance of Section 18 of the act of Congress passed March 3, 1899.

The logical force of the criticism that Section 18 of said act of Congress invests the Secretary of War with legislative or judicial functions or both is reduced to small proportions when it is remembered that the scope of this power is limited as has been shown to making an investigation and directing what changes are in his opinion necessary.

But were it otherwise and the power to hear and determine these questions judicially given to the secretary, his exercise of such jurisdiction would be unobjectionable so long as his decision was reviewable in the courts. In *State* v. *Harmon,* 31 Ohio St., 250, White, J., in speaking of the power of the committee of the state senate to hear and determine an election contest, says at page 258:

"The power of allotting to the different departments of the government their appropriate functions is a legislative power; and in so far as the distribution has not been made in the Constitution, the power to make it is vested in the General Assembly, as the depository of the legislative power of the state."

Again:

"Whether power, in a given instance, ought to be assigned to the judicial department, is ordinarily determinable from the nature of the subject to which the power relates. In many instances, however, it may appropriately be assigned to either of the departments.

"It is said, authority to hear and determine a controversy upon the law and fact is a judicial power. That such authority is essential to the exercise of judicial power, is admitted; but it does not follow that the exercise of such authority is necessarily the exercise of judicial power. The authority to ascertain facts, and to apply the law to the facts when ascertained, appertains as well to the other departments of the government as to the judiciary. Judgment and discretion are required to be exercised by all the departments."

In *Probasco* v. *Raine,* 50 Ohio St., 378, the first proposition of the syllabus is:

"If a statute is constitutional, it is valid, and can not be set aside by a court, as being against public policy or natural right.

There can be no public policy or right in conflict with a constitutional statute.''

The question in that case was whether a judicial power could be conferred upon the auditor of the county. In speaking of this subject Burket, J., says, at page 391:

''The result to be attained by the laws to be passed under this section, is equal taxation, but the means by which that end shall be attained, is left to the judgment and sound discretion of the Legislature acting within the power conferred by the Constitution.

''To have equality in taxation, all property must be brought upon the duplicate. Some officer must be authorized and empowered to cause all property to be listed for taxation. Such officer must be paid for his services, either by fees or salary. The Legislature has full power under the Constitution to say what officer shall perform such duties, and in what manner he shall be paid.

''It has enacted that such duties shall be performed by the auditor, and that he shall be paid as provided in Section 1071. In the opinion of the Legislature this is a proper means to attain, in part at least, equal taxation. It matters not whether the auditor acts judicially or ministerially in the discharge of his duties. The Legislature is free to employ such means, as in its opinion, shall be most effective, whether they be judicial or ministerial or both.

''The objection urged in argument that a man can not be a judge in his own case is a fallacy. The auditor has no case to be judged, but on the contrary, he is the taxing officer before whom other parties are cited to appear and show cause why they should not bear their equal burden of taxation. His actions in the premises are subject to review in the courts, and thereby due process of law is had.''

Under the grant of power to regulate commerce among the states an interstate commerce commission was created some years since with the power to hear and determine complaints of unreasonable rates charged by railroads. A bill is now pending in Congress by which it is proposed to enlarge the authority of this commission with a view of increasing its efficiency. This has led to a wide discussion in and out of Congress of the constitutionality and propriety of conferring such power upon the commis-

sion; and it may be safely said that no lawyer, statesman, publicist, or jurist has as yet doubted the power of Congress to confer this jurisdiction upon the commission, provided adequate provision is made for the review of its decisions by the courts.

The further and last question made by the petition, and apparently relied upon in the majority opinion, is that the bridges controlled by the officers of the civil division of the state are not within the provisions of said Section 18 and that the words "persons, corporation or association" do not include county commissioners. No authority is referred to in support of this contention. In the reported cases where prosecutions have been maintained against county commissioners, this question has not been suggested, although it has been held that no penalty could properly be imposed upon them where they were unable to comply with the order of the War Department for want of funds. That the term "persons" used in a statute, when necessary to make its provisions effective and consistent, may include artificial persons, such as bodies politic and corporate, deriving their existence from legislation, as well as natural persons and co-partnerships, is decided or illustrated by the following cases: *United States* v. *Fox*, 94 U. S., 315, 321; *Pembina Consol, S. M. & M. Co.* v. *Commonwealth*, 125 U. S., 181, 189; *Beaston* v. *Bank*, 37 U. S. (12 Pet.), 102, 134; *United States* v. *Amedy*, 24 U. S. (11 Wheat.), 392; *Santa Clara Co.* v. *Railway*, 18 Fed. Rep., 385, 404; *Krug* v. *Davis*, 87 Ind., 590, 596; *State* v. *Herold*, 9 Kan., 194; *Forrest* v. *Henry*, 33 Minn., 434, 436; *Coddington* v. *Haven*, 8 N. J. Eq. (4 Halst. Ch.), 590; *Martin* v. *State*, 24 Tex., 61; *Cincinnati Gas Light & C. Co.* v. *Avondale*, 43 O. S., 257; *Steam Canal Boat Tempest* v. *Lucas Co. (Comrs.)*, 13 C. C., 263; *Springfield* v. *Walker*, 42 Ohio St., 543. It is difficult to imagine how more comprehensive terms could have been used to include every bridge over a waterway of the United States. That this bridge is within a civil division of the state is an undoubted fact; and so are all bridges in this country in some civil division of a state, except in those in the District of Columbia and in the territories, and most of them are built and controlled

by the authorities of such civil divisions.   The capacity in which persons may exercise control, whether as agents, trustees, receivers, executors or otherwise ought not to exempt them from the consequences of maintaining a nuisance if they are persons having the power to make the alterations required by the War Department.   To construe this statute as excluding the bridges under the control of municipalities, trustees of townships and county commissioners would practically defeat the purpose and beneficial effect of the act.

Here the discussion, so far as it bears upon the questions that are legitimately raised by the demurrer, is brought to a close.

The diversity of opinions in this case is, after all, in respect to matters that have little or no connection with the real issue. Take the question of the right of defendants to compensation for their bridge.   Conceding that they have a legal right to compensation before they can be compelled to remove it, how does that question arise?   It is not made in the petition.   It does not appear that the defendants claim compensation or are entitled to any.   The discussion of that question is, therefore, irrelevant.   It is not quite accurate, however, to say that the act of Congress has been held, heretofore, to be unconstitutional, because it makes no provision for just compensation to parties entitled thereto.   It has been held, rather, that the requirements of the secretary could not, in such case, be enforced by the imposition of the penalties provided by the act; and that the enforcement of it by penalties would be in violation of the Constitution. In other words, if the right to compensation is unjustly denied in a given case the owner of the bridge could not be charged with and convicted of the offense of willfully refusing to make the alterations; for that would be inflicting punishment for insistence upon the constitutional guaranty that private property shall not be taken for public use without just compensation.

Take as an example the able discussion of the abstract proposition that the Secretary of War can not compel nor can Congress authorize him to compel county commissioners to build bridges, dredge channels, straighten old channels or make new ones.

What has the correctness of that proposition to do with this case? It is readily conceded that he can no more compel the defendants to do any of these things, than he can compel them to commit murder. Nor has he made an attempt to do so. Whatever compulsion may be enforced upon the defendants under this act, must be brought to bear by the District Court of the United States; and if not satisfactorily applied by that court a direct appeal may be taken to the Supreme Court.

Right here may be found the fundamental cause for divergency of opinions. Let it be admitted, as it must be, that county commissioners derive all their authority from the statutes of the state, and none from Congress or any department of the federal government, and we get back to the real question to be decided, whether the laws of Ohio authorized the defendants to do the things they are charged with intending to do.

No officers in the state have more ample discretionary power; and in the exercise of their judgment and discretion in matters within their jurisdiction they are not subject to the dictation or control of courts or tax-payers. While they keep within the limits of their jurisdiction they are practically omnipotent. They may remove bridges, piers and abutments and make any changes whatever so long as they act in good faith, and the expenditure does not exceed the statutory limit. Their failure to exercise good judgment and discretion does not authorize a proceeding of this character. If such were the law a large increase of the judicial force of the state might be demanded.

But for the general limitations as to expenditures the defendants might have removed the pier, abutment and fenders of this bridge and put up an entirely new structure without suggestions from the Secretary of War. The act of March, 1904, merely enlarged the limit of their expenditures in cases where a bridge over a navigable waterway was condemned or ordered removed by the War Department as an obstruction to navigation. Their authority to make this larger expenditure was complete when the order of the secretary in respect to this bridge was made; not because they were under compulsion to obey the order but

because the condition had happened, giving them the power to make such expenditure and their attempt thereupon to remove the old bridge with its fenders and piers and put in a new one was strictly within the express authority conferred by law. If this position is correct, then the claim that the defendants were intending to do more than was suggested by the secretary is also irrelevant. The pertinent inquiry is, were they intending to do more than they had authority to do under the laws of Ohio. If they were not, how could they be enjoined in this proceeding on the ground that their proposed action was in contravention of law?

The published opinion of my brother Cook is like a two-edged sword. It assaults the main fabric of the elaborate opinion of our distinguished associate, with intent to destroy, and then reaches the conclusion that the demurrer should be overruled on other, and possibly less tenable grounds.

It asserts that the demurrer admits that the bridge is no obstruction to the free navigation of the river, and hence "there was nothing for the secretary to base his order upon." This is a clear misapprehension of the contents of the petition. The petition alleges, "said bridge is not an unreasonable obstruction to navigation," thereby implying that it is some obstruction. It also avers, "if there is any difficulty in passing said bridge by the largest and longest boats, it is owing to the shape of the river and not to any fault in the bridge." This makes the implication clearer that navigation is impeded and difficult at this point. These allegations fall far short of making good the assertion that "the allegations of the petition show there was no obstruction." The unsoundness of the argument based upon such grounds is apparent, since it is immaterial what the petition declares in that respect. The authority of the commissioners under the statute is not made to depend upon the justness or propriety of the order of the War Department, but solely on the fact that it is made.

The invalidity of the order of the Secretary of War is asserted on the ground that he undertakes to direct the removal of the

center pier which stands on land purchased by the county and directly outside the bounds of the river. The petition states that the center pier is on the east side of the river, "and entirely east of the established dock and harbor lines of said harbor," and that the bridge opening is "exactly over and substantially the entire width of the present and natural channel of the river."

These statements may be literally true and the pier yet stand within the bounds of the river. The reasonable inference from these guarded statements of the petition is, that it does. A portion of the order of the Secretary of War has been introduced into the majority opinion and from that we learn that, "the existence of the center pier and its fender in the river," is an obstruction to its free navigation. Although the order of the secretary declares they were so placed, the petition maintains a discreet silence on that point. The fenders consist of piling so driven as to protect the bridge, when open, against injury from passing boats. The petition says, "at the point said bridge crosses there is a bend in the river with its curve to the west.." From this statement there must be a bend of the river to the east both above and below the center pier, which would make it impossible for both ends of this straight bridge, when open, to coincide with the curvature of the stream. One end of it must necessarily lie to some extent over the river, and be protected in that position by fenders. The order of the secretary is that the opening shall be 140 feet between the fenders; thereby requiring the removal of the center pier more than twenty feet to the east, by reason of the bend in the stream; and thereby the pier and fenders would become useless obstructions, which the commissioners placed there and which they seem willing to remove. Whether the value of the piles and the stone in the pier would be more or less than the cost of their removal and clearing out the channel where they stand to the depth of the other parts of the channel is not shown.

If the commissioners chose to carry the center pier further to the east and thereby increase the length of the draw span,

or chose to make a new bridge of the jack-knife or lift pattern, as surmised and alleged, this would not contravene any law of the state, as the form and pattern of bridges and the location of piers and abutments are matters resting in the discretion of the commissioners. Besides, the act of 1904 expressly confers authority in such cases to purchase or appropriate land to widen such stream or streams.

The charge that the commissioners entered into an agreement, collusive or otherwise, with the Secretary of War with respect to removing or rebuilding this bridge is not supported by any allegation of the petition, nor was it hinted at in the argument of the case.

These suggestions as to the action of the secretary are made for the purpose of attempting to show that his order was neither arbitrary, illegal, nor unreasonable. Stripped of all irrelevant and collateral matters which have no proper place in the petition or in this discussion, the material facts stated in the petition are: that some seventeen years ago this bridge was built at a sharp curve in the river with a draw span sufficient to enable the ordinary vessels of that day to pass in safety; that since then the size of vessels has been greatly increased, until now it is well nigh impossible to warp them through the draw opening around the sharp curve; that upon the complaint of the railroad companies having extensive docks above the bridge, and upon their application and representations the War Department ordered certain alterations and changes to be made of which due notice was given to the commissioners; that said alterations and changes required the removal of the entire bridge structure, including the fenders and central pier, and the dredging of the channel at that point to the depth of twenty-one feet; and that in pursuance of said notice and the authority conferred upon them by the act of March, 1904, the defendants as county commissioners were proceeding to consummate said alterations and changes, without submitting the policy of the improvement to a vote of the people. The substantial grounds relied upon in the hearing of the case were, that said act of the Legislature was

unconstitutional and that said act of Congress did not apply to county commissioners.

No member of this court holds said act of the Legislature to be unconstitutional; and only one member, if any, holds that the act of Congress does not apply to county commissioners. Section 18 of the act of Congress which has been drawn in question. is held by the majority of the court to be constitutional; and yet the majority of the court hold that the commissioners were acting in contravention of law.

It is to be regretted that in reaching this conclusion it was found necessary to condemn an act of Congress, criticise an act of the General Assembly of Ohio, condemn the decisions of the federal courts, condemn the action of the Secretary of War, impute dishonest motives to the United States engineers, charge the county commissioners with fraud and collusion, as also the railroad companies, and impeach the intelligence of the counsel for the defendants. In justice to the attorneys it should be said that they were not guilty of the imputed absurdity of claiming that this was not a county bridge. Neither the defendants, the United States officers, nor the railroad companies owning docks above the bridge were shown to have been actuated, in what they did, by any baser motive than an honest desire to protect and improve the navigable channels of commerce. The serious consequences of this decision to the defendants and the public has induced this somewhat protracted dissenting opinion and the discussion of many irrelevant matters.

By the judgment in this case the execution of the laws of the United States is obstructed and temporarily thwarted, a necessary improvement upon which great public interests depend is delayed, and the defendants placed in a double jeopardy from which their escape may be problematic whatever course they pursue; and all this is done not in behalf of the enforcement of salutary laws according to their manifest letter and spirit, but against their proper enforcement, although the same have received, for more than half a century, either directly, or by analogy and upon principle, the sanction of the highest judicial tribunals in the land.

For these reasons I am forced to dissent from the judgment entered in this cause.

*M. G. Spaulding* and *E. H. Starkey,* for plaintiff in error.

*White, Perry & Roberts* and *C. L. Taylor,* for defendants in error.